AE

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARNISA BELL,<br>TIFFANY FIELDS-FEAGINS<br>and JULIA POSLEY | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )   No. 03 C 0607<br>) |
| LASALLE BANK N.A./ABN<br>AMRO N.A., INC. | )<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Arnisa Bell, Tiffany Fields-Feagins, and Julia Posley filed a four-count Second

Amended Complaint against their former employer, defendant LaSalle Bank N.A./ABN AMRO

N.A., Inc. ("LaSalle"). Plaintiffs allege that LaSalle discriminated against them by denying them

promotions in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

(Count I), and 42 U.S.C. § 1981 (Count II). Plaintiffs also allege that LaSalle violated Title VII

(Count III) by retaliating against them for filing Charges of Discrimination with the Equal

Opportunity Employment Commission ("EEOC"), as well as for filing the present lawsuit.[1]

Before the court are (1) Plaintiffs' motion for summary judgment on Count III; (2) Plaintiffs'

motion to strike certain portions of LaSalle's responses to Plaintiffs' Local Rule 56.1 Statement

---

[1]Plaintiffs also alleged that LaSalle violated the Illinois Whistleblower Act, 775 ILCS 5/1-101, etc. (Count IV) by retaliating against them for reporting illegal behavior to the appropriate regulatory agency. The court, however, granted LaSalle's motion to dismiss Plaintiffs' claim under the Illinois Whistleblower Act for lack of subject matter jurisdiction because the Illinois Whistleblower Act is preempted by the terms of the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq. See* January 10, 2005 Memorandum Opinion and Order [Docket # 78].

of Material Facts; (3) LaSalle's motion for summary judgment on all of Plaintiffs' claims; (4) LaSalle's motion to strike portions of Plaintiffs' Local Rule 56.1 Statement of Material Facts; and (5) LaSalle's motion to strike portions of Plaintiffs' response to LaSalle's Local Rule 56.1 Statement of Material Facts. The court has jurisdiction over this action pursuant to 42 U.S.C. 2000e-5(f) and 28 U.S.C. §§ 1331 and 1343. For the reasons stated below, the court grants in part and denies in part Plaintiffs' motion to strike, grants in part and denies in part LaSalle's motions to strike, denies Plaintiffs' motion for partial summary judgment, and grants LaSalle's motion for summary judgment.

## I.    SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the

2

non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II.    MOTIONS TO STRIKE

### A.    LaSalle's Motion to Strike Certain Paragraphs in Plaintiffs' Local Rule 56.1 Statement of Additional Facts

#### 1.    Failure to properly cite to supporting evidence or attach supporting material

LaSalle moves to strike paragraphs 52, 183 through 186, 265, 302, and 307 of plaintiff's Local Rule 56.1 Statement of Material Facts, arguing that Plaintiffs fail to cite evidence in support of these statements of fact.

With respect to paragraphs 52, 183, 185, and 186, Plaintiffs identify the deposition that they allege supports their factual assertions but fail to identify either the relevant page number(s) or to attach the deposition. Where possible, the court has made a good-faith effort to determine what portion of the cited materials corroborate Plaintiffs' assertions, but the court has been unable to identify any support for the above-referenced paragraphs. Moreover, while Plaintiffs had the opportunity to respond to LaSalle's objections to these paragraphs, Plaintiffs neglected to do so. In light of the foregoing, these statements are stricken.

Turning to paragraphs 184, 265, and 302, Plaintiffs fail to cite to the part of the record that supports their position. Accordingly, these statements are stricken. *See United States* v. *Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried" in the record). *See also Greer* v. *Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) ("a lawsuit is not a game of hunt the peanut.").

While Plaintiffs identify a document that they allege supports paragraph 307, they fail to

3

attach the document to the statement or to direct the court to its location. Accordingly, this statement is also stricken.

### 2. Mischaracterization of the evidence offered in support of the propounded statement

LaSalle also moves to strike paragraphs 98, 152, 195, 200, 208, and 348, arguing that the evidence cited by Plaintiffs does not support these statements. The court agrees. Plaintiffs repeatedly mischaracterize or stretch the cited evidence. These statements are therefore stricken to the extent that they are not supported by the evidence.

### 3. Reliance on hearsay, opinion testimony, or conjecture

LaSalle further moves to strike paragraphs 86, 118, 36, 220, 222, 223, 277, 314, and 315, arguing that Plaintiffs attempt to support these statements with hearsay, opinion testimony, or conjecture.

Inadmissible hearsay cannot be used to create a genuine issue of material fact. *Winskunas* v. *Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994). Rule 801(c) of the Federal Rules of Evidence ("FRE") defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A statement offered for some other purpose is not hearsay. *See United States* v. *Bursey*, 85 F.3d 293, 296 (7th Cir. 1996).

Paragraphs 86 and 277 are inadmissible hearsay. Both paragraphs are out-of-court statements allegedly made by Plaintiffs' co-worker offered to establish the truth of the matter asserted: namely, that Plaintiffs' co-worker did not have supervisory experience prior to accepting a position with LaSalle. Similarly, Paragraphs 314 and 315 are inadmissible because

4

they are offered to prove the asserted facts in an effort to establish that Plaintiffs' supervisors were hostile to Plaintiffs after Plaintiffs had filed charges of discrimination with the EEOC. Accordingly, paragraphs 86, 277, 314, and 315 are stricken.

Paragraph 118, on the other hand, is not hearsay because it is offered not for the truth of the matter asserted but for the purpose of establishing notice, i.e., that Posley informed her supervisor that she disagreed with his promotion decision. *See United States* v. *Robinzine*, 80 F.3d 245, 252 (7th Cir. 1996) (statements containing no assertion of fact that could be verified were not hearsay because their significance "was that they were said (i.e. that a 'verbal act' occurred) and how they affected [the listener], not the truth-value of what was said.") (emphasis in original). LaSalle's motion to strike paragraph 118 is therefore denied.

Turning to paragraph 136, it is relevant and admissible that at approximately the same time Plaintiffs were denied the promotion, Plaintiffs' supervisor revised the job description for that position. Paragraph 136, however, goes well beyond this straightforward assertion by positing as fact Bell's speculation about her supervisor's motivation for revising the job description. Plaintiffs' subjective belief, speculation and conjecture cannot create a genuine issue of material fact. *McMillian* v. *Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989). Accordingly, paragraph 136 is stricken as to Bell's belief and speculation.

Paragraphs 220, 222, and 223 each allege that LaSalle employees regularly removed bank documents from the bank and that LaSalle did not maintain a policy prohibiting such conduct. In some instances, these assertions are based on mischaracterizations or exaggerations of the cited testimony. In those instances, the assertions are based on nothing more than Plaintiffs' speculation. Indeed, although Plaintiffs repeatedly allege that LaSalle employees took bank

5

documents home with them, Plaintiffs fail to identify a single instance in which they actually observed a LaSalle employee take a bank document out of the bank. As such, these statements are stricken.

### 4. Lack of foundation

LaSalle moves to strike paragraph 207, which relates to a "To Do" list prepared by Plaintiffs' supervisor, on the grounds that the Plaintiffs have not authenticated the supporting documents..

Rule 901(a) of the FRE provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A document may be authenticated by a witness with knowledge who testifies that the material is what its proponent purports it to be.

Randall Hampton, the LaSalle employee who made the decision to terminate Plaintiffs' employment, testified that he had reviewed the bank documents that Plaintiffs had provided to their attorneys, including at least one of the "task lists" allegedly prepared by Plaintiffs' supervisor, and determined that the documents were "legitimate bank documents that should not have been removed from the bank." Defendant's Local Rule 56.1 Statement of Material Facts ("DSF") ¶ 99. This testimony is sufficient to authenticate the "To Do" lists and therefore, LaSalle's motion to strike paragraph 207 is denied.

### 5. Reliance on testimony regarding settlement negotiations

Finally, LaSalle moves to strike paragraph 245, arguing that the statement is based on inadmissible testimony regarding LaSalle's participation in the EEOC settlement/conciliation process. The court agrees.

FRE 408 provides that "[e]vidence of conduct or statements made in compromise negotiations is [ ] not admissible." In addition, Title VII specifically protects the confidentiality of the conciliation process. *See* 42 U.S.C. § 2000e-5(b) ("Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned.").

Paragraph 245 involves the statements made and the position taken by LaSalle with regard to the potential settlement of Plaintiffs' charges of discrimination during the EEOC conciliation process. As such, this statement is stricken.

### A. LaSalle's Motion to Strike Certain Responses in Plaintiffs' Response to LaSalle's Local Rule 56.1 Statement of Material Facts

### 1. Reliance on Hearsay

Plaintiffs object to paragraphs 37, 38, 42, 43, 44, 47, 48, 49, 50, 64, 65, 71, 73, 75, and 78 of LaSalle's statement of material facts, arguing that the paragraphs are based on inadmissible hearsay. The statements objected to by Plaintiffs are not hearsay because they are evidence of the state-of-mind of the LaSalle employees who made the contested employment decisions. *See Simms* v. *Blue Cross Blue Shield Assoc.*, 2003 WL 1877639 (N.D. Ill. Apr. 14, 2003) ("In an employment discrimination case, statements…which relate to the employer's perception of the employee's job performance are not hearsay when they are offered to rebut the Plaintiff's allegation of discriminatory motive."). Contrary to Plaintiffs' misguided argument, there are multiple employment decisions made by multiple LaSalle employees at issue in this case. Indeed, Plaintiffs vigorously maintain that the promotions of Jill Thompson and Rebecca Sobodas are evidence of LaSalle's discrimination. And it is undisputed that Jean Kendrick made,

in whole or in part, the promotion decisions regarding Thompson and Sobodas. Thus, evidence relating to Kendrick's state-of-mind is relevant and admissible. Furthermore, Plaintiffs' supervisor Terrance Tate was responsible for *recommending* whether Plaintiffs ought to receive the promotion at issue in this case; Kendrick, Tate's supervisor, was the LaSalle employee ultimately responsible for *deciding* whether Plaintiffs were promoted. Similarly, the state-of-mind of Marilynne Delany, the LaSalle employee who became Tate's supervisor in December 2001, is relevant because she also participated in the decision not to promote Plaintiffs.

In contrast, Plaintiffs properly raise hearsay objections to paragraphs 66 and 81, both of which relate to out-of-court statements made to Emily Vander Lugt, a LaSalle employee who became manager of LaSalle's Reconciliation department in April 2002. There is no evidence that Vander Lugt participated in any contested promotion decision relating to Plaintiffs. As such, her state-of-mind is irrelevant. Therefore, paragraphs 66 and 81 of LaSalle's statement of material facts are stricken.

Plaintiffs hearsay objection to paragraph 75 is misplaced but the statement is nevertheless properly stricken because the document LaSalle relies on in support of the statement has not been properly authenticated. Accordingly, the statement is stricken. *See* FRE 901(a).

Finally, with regard to paragraph 47, Posley testified during her deposition that Tate made the objected-to-statement that LaSalle relies on to support paragraph 47. As such, Posley's testimony regarding Tate's statement is admissible as an admission of a party opponent. *See* FRE 801(d)(2)(A).

## 2. Denial of a statement that is clearly not in dispute

LaSalle moves to strike Plaintiffs' responses to paragraphs 39, 40, 42, 52, 54, 55, 57, 59,

61, 63, 65, 74, and 77 of its statement of material facts because Plaintiffs attempt to create an issue of fact by denying some of LaSalle's statements that are not actually in dispute. Plaintiffs consistently rely on evidence that does not dispute LaSalle's factual assertion but merely qualifies the stated fact. For example, LaSalle asserts in paragraph 59 that "[w]hen Posley requested an explanation for why she had not been invited to a particular meeting in late January or early February of 2004, Oyos assured her that it was an oversight and apologized numerous times." The support for this statement comes straight from Posley's deposition. Plaintiffs deny paragraph 59, claiming that Posley testified that Oyos' apology and explanation was not credible. The mere fact the Posley did not believe or accept Oyos' apology, however, is an inadequate basis to deny that Oyos in fact apologized on numerous occasions. Accordingly, the denial to paragraph 59 is inappropriate. Likewise, Plaintiffs' objections to the remaining above-referenced paragraphs are inappropriate and the facts are therefore deemed admitted.

Plaintiffs' objections to paragraphs 49 and 83, however, are justified because each of the statements includes mischaracterizations of the cited testimony. In paragraph 49, LaSalle states, "Posley acknowledged she was responsible for the problems...." In fact, Posley acknowledged only that she was responsible for the work that was not completed on time. Posley steadfastly disclaimed responsibility for the failure to complete the assignment in a timely fashion. Similarly, LaSalle asserts in paragraph 83 that Fields-Feagins "acknowledged that Halter was correct that she needed further development in order to be an Analyst II...." Fields-Feagins, however, testified only that she had room for development, not that any additional development was necessary in order for her to be qualified for promotion. LaSalle also asserts in paragraph 83 that "Fields-Feagins admitted that Halter believed that she was not qualified to be an Analyst

II...." Fields-Feagins actually testified that she believed Halter's assessment of her performance was not accurately reflected in her 2002 performance review because he was required to account for Tate's negative assessment of her performance during the first part of 2002.

Finally, LaSalle's assertion in paragraph 82 that "Halter identified many of the same issues raised by her previous managers..." is impermissible argument and therefore, is stricken.

### 3.    Contradiction in responses

Plaintiffs' responses to paragraphs 36, 60, and 69 directly contradict admissions made by Plaintiffs in their responses to other paragraphs and in their Motion for Partial Summary Judgment. Plaintiffs have not attempted to provide an explanation for the discrepancy despite having the opportunity to do so. Accordingly, Plaintiffs' responses to paragraphs 36, 60, and 69 are stricken. *See Koszola* v. *Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1108-1109 (7th Cir. 2004) (affirming district court's decision to strike plaintiff's response to defendant's statement of fact because it "inherently contradicted facts in the [defendant's] statement that [plaintiff] had admitted.").

### C.    Plaintiffs' Motion to Strike Certain Responses to Plaintiffs' Local Rule 56.1 Statement of Material Facts

Plaintiffs' move to strike LaSalle's responses to paragraphs 10, 11, 16, 17, 20, 21, 23, 45, 46, 47, 48, 50, 51, 56, 59, 62, 63, 66, 67, and 81 of their statement of material facts, arguing that LaSalle's responses include new facts or additional information in an attempt to deny some of Plaintiffs' statements that are not actually in dispute.

LaSalle's responses to paragraphs 46, 48, 51, and 66 are indeed improper. LaSalle admits these statements but then improperly includes additional and unnecessary facts. As a result, the

additional information in LaSalle's responses to these paragraphs will be disregarded. *See Malec v. Sanford,* 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("Rule 56.1(b)(3)(B) 'provides the only acceptable means of … presenting additional facts.'") (quoting *Midwest Imports, Ltd.* v. *Coval,* 71 F.3d 1311, 1316 (7th Cir. 1995) (emphasis in original).

LaSalle's responses to paragraphs 10, 11, 16, 17, 20, 21, 23, 45, 47, 48, 50, 56, 59, 62, 63, 66, 67, and 81, however, are appropriate. In each instance, LaSalle's response properly identifies mischaracterizations of testimony or asserted facts unsupported by the cited material. Accordingly, the court denies Plaintiffs' motion to strike as to these paragraphs.

## III. Statement of Facts

### A. Plaintiffs Join the Reconciliation Department

In 2000, LaSalle hired or transferred Plaintiffs, who are all African-American women, into its Trust Reconciliation Department ("Reconciliation Department") as Trust Compliance Analysts I ("Analyst I"). DSF ¶¶ 6, 8, 9, 11. As Analysts I, Plaintiffs were were responsible for reconciling accounts for different business units. *Id.*

Posley began her employment with LaSalle on May 11, 1998 as a Reconciliation Clerk in the Global Custody Department. *Id.* at ¶ 10. Posley was promoted to the position of Analyst I in the Reconciliation Department in June of 2000, where she was given increasingly complex work that she successfully handled with little supervision. *Id.* at ¶ 11. By the time she joined the Reconciliation Department, Posley had nearly 15 years of experience in the banking industry.

Bell began her employment with LaSalle on October 10, 2000. *Id.* at ¶ 8. At the time she was hired, Bell was pursuing a degree in accounting, which she ultimately received in January 2002. *Id.* Prior to joining LaSalle, Bell had held various accounting positions, though none of

11

the positions were in the securities or banking industry. *Id.*

Fields-Feagins began her employment with LaSalle on August 1, 2000. *Id.* at ¶ 9. Of the Plaintiffs, Fields-Feagins was the least experienced. At the time she was hired, Field-Feagins had only limited knowledge of securities. *Id.*

Within the Reconciliation Department, the position immediately above Analyst I was Analyst II, or "Senior Analyst." *Id.* at ¶ 5. Promotion from Analyst I to Senior Analyst was a "career progression promotion, " which meant that an Analyst I was recommended by their manager for promotion when and if the analyst qualified for the promotion. Plaintiffs' Local Rule 56.1 Statement of Material Facts ("PAF") ¶ 1. Because the promotion from Analyst I to Senior Analyst was a career progression promotion, there was no limit to the number of analysts who could at any one time hold the rank of Senior Analyst. *Id.* at ¶ 2.

To be eligible for promotion to Senior Analyst, an Analyst I had to demonstrate that she possessed (1) the type of sophisticated accounting experience or education necessary to handle the complex and sophisticated accounts given to a Senior Analyst; and (2) strong interpersonal skills to allow her to effectively service internal LaSalle clients, step into a leadership role amongst her peers, and serve as a resource to the Reconciliation Department for processing difficult transactions. *Id.* at ¶ 7.

## B.    The Primary Decision-Makers for the Contested Promotion Decisions

Throughout much of 2001, Jean Kendrick, a Caucasian female, served as the Reconciliation Department's unit manager, while Terrance Tate, an African-American male, served directly beneath her as the department's day-to-day supervisor. DSF at ¶¶ 14, 16, 17; PAF ¶ 13, 14. Kendrick hired Tate but quickly became dissatisfied with his performance and

12

recommended to her supervisor that he be terminated. PAF ¶ 18. Kendrick's supervisor rejected her recommendation and instructed Kendrick to work with Tate to improve his performance. *Id.* at ¶¶ 22, 24, 26. Kendrick disagreed with her supervisor's decision, believing that it was unduly influenced by LaSalle's pursuit of affirmative action goals. *Id.* at ¶ 27. Nevertheless, Kendrick did as instructed, ultimately helping Tate improve his performance to the point that she no longer recommended his termination. *Id.* at ¶ 28.

## C.    Jill Thompson and Rebecca Sobodas Join the Reconciliation Department

At the start of 2001, there were no Caucasian analysts or Senior Analysts in the Reconciliation Department. Within weeks, however, LaSalle hired or transferred two Caucasian women into the department: Jill Thompson and Rebecca Sobodas. Thompson transferred into the Reconciliation Department as a Senior Analyst in early 2001 from a supervisory position in LaSalle's Land Trust Operations department. DSF at ¶ 37. Sobodas, commenced her employment with LaSalle as a temporary employee in the department in January 2001 and was promoted to Senior Analyst in December 2001. *Id.* at ¶ 42.

Kendrick was familiar with Thompson, having worked with her in the Land Trust Operations department. *Id.* at ¶ 40. Based largely on her first hand knowledge of Thompson's experience and job performance, Kendrick believed that Thompson had substantial accounting, banking, and securities knowledge; a good working knowledge of the products that were processed in the Reconciliation Department; project management experience; good communication skills; and good technical skills, including knowledge of Excel. *Id.* at ¶¶ 39, 40.

Unlike Thompson, Sobodas had never worked at LaSalle prior to joining the Reconciliation Department. Sobodas had been an accounting supervisor with a securities broker

13

dealer, where she gained relevant securities industry reconciliation experience. *Id.* at ¶ 42. Based on that experience, Kendrick and Tate considered hiring Sobodas as a Senior Analyst, but ultimately decided to hire her as an Analyst I so that "[they] would be able to offer her a promotion as an enticement to stay with [LaSalle] longer." *Id.* at ¶ 42. At LaSalle, Sobodas took over some of the most difficult reconciliation accounts. *Id.* at ¶ 43. During her first ten months of employment, Sobodas streamlined processes and resolved a complex account with little supervisory guidance. *Id.* Kendrick believed that Sobodas' internal clients highly respected her work. *Id.*

### D.   Events Giving Rise to Plaintiffs' Claims

In the Fall of 2001, as rumors began to circulate through the department that Sobodas was about to be promoted, Plaintiffs became increasingly dissatisfied with Tate's supervision of the Reconciliation Department. Plaintiffs believed that Tate gave Thompson and Sobodas preferential treatment regarding seating assignments, access to temporary employee assistance, workloads, and vacation requests. PSF ¶¶ 37, 38, 39,40, 41. In addition, Plaintiffs believed that impermissible considerations of race influenced Tate's decisions to report an African-American employee's absences to the human resources department, and not to report Thompson when she missed three days in a two-week period in August and September 2001. *Id.* at ¶ 152.

Plaintiffs voiced their concerns in a November 2001 meeting with Tate after he confirmed Sobodas' impending promotion and showed them a revised job description for the Senior Analyst position that they believed was personalized to fit Sobodas' qualifications. *Id.* at ¶ 83-85. At that meeting and at others, Plaintiffs asked Tate why they were not also being promoted to Senior Analyst. *Id.* Tate advised Posley that she was not being promoted because, among

14

other reasons, she had failed to train a temporary employee fast enough. *Id.* at ¶ 117. Tate told Bell that she had not been considered for promotion because she had failed to make Kendrick sufficiently aware of her contributions to the department. *Id.* at ¶ 110. When Fields-Feagins asked Tate why she had not been promoted, Tate was unable to give her an answer. *Id.* at ¶ 100.

Shortly thereafter, Bell and Fields-Feagins received verbal and written criticisms of their job performance, which they believed were a direct result of the fact that they questioned Sobodas' promotion. *Id.* at ¶¶ 89, 101, 137, 165, 170. After registering their disagreement in written rebuttals to their performance reviews, Bell and Fields-Feagins met separately with Marilynne Delany, Kendrick's successor as unit manager. *Id.* Following Bell's meeting with Delany, Bell's performance review was revised to reflect more accurately the contributions Bell had made to the department before Tate became Reconciliation Department supervisor. *Id.* at ¶ 167. Delany advised Fields-Feagins that her review would also be rewritten, although this rewrite never occurred. *Id.* at ¶ 174.

### E.    Posley Promoted to Senior Analyst

Posley also met with Delany but not to discuss her performance review; Posley did not challenge her "exceeds expectations" performance rating. Instead, Posley met with Delany to discuss what she needed to do in order to qualify for promotion to Senior Analyst. DAF at ¶ 54. Delany recommended a meeting with Posley's main internal client, Erlinda Oyos, who had repeatedly complained about Posley's job performance and professionalism. *Id.* Posley agreed, and shortly thereafter, a meeting was held between Oyos, Posley, Tate and Delany, during which Oyos formally identified her expectations of Posley. In the months following the meeting, Oyos made no further complaints regarding Posley's performance. *Id.* As a consequence, according to

Delany, Posley then became "promotable." *Id.* at ¶ 55.  In any event, on March 12, 2002, Tate and Delany, in consultation with Kendrick, promoted Posley to Senior Analyst. *Id.* at ¶ 56.

### F.   Plaintiffs' Formal Complaints of Discrimination and Retaliation

Believing by this time that they were victims not only of discrimination but also retaliation, Plaintiffs submitted Charges of Discrimination Questionnaires to the EEOC on or about December 13, 2001. *Id.* at ¶ 32.  On February 21, 2002, Plaintiffs perfected their Charges of Discrimination by signing the Charges prepared by the EEOC. *Id.*

Around the same time, Plaintiffs began accumulating evidence that they believed supported their allegations of discrimination. *Id.* at ¶ 92.  On several occasions, Plaintiffs discovered documents inadvertently left on the Reconciliation Department's copier machine that Plaintiffs believed would help their case. *Id.* at ¶¶ 94, 95, 96.  Plaintiffs found at least one document in the trash with other documents and materials that had been discarded by LaSalle employees charged with emptying the contents of Tate's desk following his termination.  On each occasion, Plaintiffs made a photo-copy of the document, placed the original back where it was found, and retained the copy for their records.  *Id.* at ¶¶ 94, 95, 96.  By the time Plaintiffs were terminated, Plaintiffs had copied a personnel record of proposed job performance objectives for Thompson; a personnel record of proposed job performance objectives for Sobodas; several "To Do" lists prepared by Tate that reminded him to "develop list of requirements for Senior Reconciliation Analyst Position and identify where Arnisa Bell did not meet these requirements;" and an internal e-mail from Kendrick to Tate.  *Id.* at ¶¶ 94, 95, 96.

After LaSalle learned in February of 2002 that Plaintiffs had filed Charges of

Discrimination with the EEOC, John Grubbs, a Caucasian male and LaSalle's Head Human Resources Advisor, investigated Plaintiffs' allegations of discrimination and retaliation. PAF at ¶¶ 131. Based on his investigation, Grubbs concluded that the "determining factor" for why Sobodas was promoted to Senior Analyst while Plaintiffs were not was that Sobodas had "over five years" of "trust accounting" experience performing the exact work required of a Senior Analyst. PAF at ¶¶ 131.

### G. Posley's Final Written Warning

At some point in 2002, Michael Halter, a Caucasian male and Tate's successor as Reconciliation Department supervisor, asked Posley to assume an account previously handled by Sobodas since Sobodas was scheduled to be out of the office due to her father's illness. *Id.* at ¶ 250. When Sobodas returned several weeks later, Posley met with Halter to discuss the possibility of returning the account to Sobodas. *Id.* at ¶ 254. At that meeting, Posley admitted that she had failed to timely complete certain portions of the reconciliation, though she advised Halter that Sobodas had agreed to complete the unfinished work. *Id.* at ¶ 255. On October 15, 2002, LaSalle issued Posley a "final written warning" for failing to complete a reconciliation project and failing to timely inform her supervisor that the work had not been done. DAF at ¶ 57.

Grubbs initially disagreed with the decision to issue Posley the "final written warning." PAF at ¶ 260. Emily Vander Lugt, Delany's successor as Reconciliation Department unit manager, however, explained to Grubbs why she believed the "final written warning" was justified. *Id.* After hearing Vander Lugt's explanation, Grubbs sent an e-mail to Vander Lugt and other decision-makers stating that he "fully support[ed]" their decision to issue the "final written warning." *Id.*

17

## H. Plaintiffs' Separation from LaSalle

On August 25, 2003, Fields-Feagins voluntarily resigned from her employment at LaSalle. DAF at ¶ 87. When Fields-Feagins resigned, a LaSalle human resources employee mistakenly designated Fields-Feagins as ineligible for rehire. *Id.* at ¶ 88. After the mistake was brought to the employee's attention, Fields-Feagins' "Personnel Action Form" was revised and she was designated eligible for rehire effective the date of her resignation. *Id.* at ¶ 89.

During Plaintiffs' depositions in the present matter, Plaintiffs admitted that they had copied LaSalle documents, removed them from the bank, and provided them to their attorney in an effort to substantiate their allegations. DAF at ¶¶ 91-96. In February 2004, shortly after the completion of Plaintiffs' depositions, Plaintiffs' document appropriation was brought to the attention of Randall Hampton, an African-American male who was employed as Executive Vice-President of Global Trust Services.[2] *Id.* at ¶ 99. After reviewing Plaintiffs' deposition testimony, as well as the documents appropriated by Plaintiffs, Hampton terminated Posley and Bell for violation of a LaSalle policy that prohibited employees from removing internal bank documents from the premises. *Id.* Based on Hampton's decision, Bell and Posley were terminated on February 19, 2004. *Id.* at ¶ 104.

## IV. Race Discrimination Claim

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

---

[2] Plaintiffs contend that LaSalle first learned that Plaintiffs removed documents from the bank during a March 7, 2002 meeting between Plaintiffs and Grubbs. The cited deposition testimony, however, does not support their contention. Grubbs testified that Plaintiffs informed him that they had found documents on the office copier, not that they had copied the documents and provided them to their attorney. Accordingly, the court finds that LaSalle first learned of Plaintiffs' copying and dissemination of bank documents following Plaintiffs' depositions.

respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Plaintiffs may establish a claim of race discrimination under Title VII through either the direct or the indirect, burden-shifting method established by the Supreme Court in *McDonnell Dougals Corp.* v. *Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[3] "The direct method of proof permits [ ] plaintiffs to show, by way of direct or circumstantial evidence, that [their] employer's decision to take an adverse job action against [them] was motivated by an impermissible purpose, such as [race.]" *Rhodes* v. *Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Cianci* v. *Pettibone Corp.*, 152 F.3d 723, 727 (7th Cir. 1998)). Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers* v. *City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003); *Plair* v. *E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). In short, "[d]irect evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Rogers*, 320 F.3d at 753 (citation omitted). Plaintiffs can also prevail under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision-maker." *Troupe* v. *May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Circumstantial evidence of discrimination may include (1) "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group;" (2) evidence that "employees similarly situated to the plaintiff other than in the characteristic ... on

---

[3]Plaintiffs' complaint includes 42 U.S.C. § 1981 claims, but the methods and order of proof applicable to Title VII and § 1981 are identical. *Hong* v. *Children's Mem. Hosp.*, 993 F.2d 1257, 1266 (7th Cir. 1993). The court's analysis and conclusions therefore apply to Plaintiffs' § 1981 and Title VII claims.

which an employer is forbidden to base a difference in treatment received systematically better treatment;" (3) evidence that "the plaintiff was qualified for the job in question but passed over in favor of ... a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe*, 20 F.3d at 736. That circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Otherwise, plaintiffs must proceed by way of the indirect method.

## A.    Direct Method of Proof

Plaintiffs contend that the record evidence contains circumstantial evidence of intentional race discrimination sufficient to survive summary judgment under the direct method of proof. Plaintiffs circumstantial evidence consists of the following allegations: (1) Tate required Plaintiffs to carry a larger work load than the Caucasian employees; (2) Tate assigned a temporary employee to assist Thompson and refused to allow the temporary employee to assist Bell; (3) Tate yelled at and demeaned African-American employees, but was cordial, polite and friendly with the Caucasian employees; (4) Tate approved Sobodas' vacation request but denied Posley's request during the same time period; (5) Tate maintained a racially segregated seating arrangement in the Reconciliation Department and when Plaintiffs asked Tate why, Tate told Plaintiffs that the Caucasian employees would not like sitting with them because of the kind of music Plaintiffs listened to; (6) Tate reported the absenteeism of an African-American employee to the human resources department but took no action in response to a Caucasian employee's absences; (7) Tate gave Plaintiffs undeserved, negative performance evaluations; (8) Tate gave Sobodas and Thompson undeserved, positive performance evaluations; (9) Tate revised the

written requirements for the Senior Analyst position to conform to Sobodas' qualifications; (10) Grubbs and Delany proffered inconsistent explanations for Sobodas' promotion; and (11) Kendrick resented that she was not permitted to terminate Tate because of LaSalle's affirmative action goals.

Plaintiffs' circumstantial evidence of discrimination does not present a genuine issue of material fact that they were denied promotions in the Fall of 2000 because of their race. The majority of Plaintiffs' evidence of discrimination concerns hostility towards Plaintiffs by Tate. While the fact that Tate is also African-American does not automatically preclude an inference that he was motivated by a discriminatory animus, it does militate against it. *See Parker* v. *Rockford Park Dist.*, 2001 WL 114405*4 (N.D. Ill. Feb. 2, 2001) (African-American plaintiff's supervisor's statement that "This looks bad. I ought to fire your black ass ..." did not support an inference of discrimination where the supervisor and the plaintiff's ultimate replacement were both African-American); *Plair* v. *E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 n. 4 (7th Cir. 1997) (fact that plaintiff's supervisor was African-American cut against African-American plaintiff's discrimination claim); *Rush* v. *McDonald's Corp.*, 966 F.2d 1104, 1118 n. 50 (7th Cir. 1992) (fact that plaintiff's replacement was also African-American suggested that employer's stated reason for the plaintiff's termination was not pretextual).

But the bigger problem with Plaintiffs' "mosaic" is that there is no basis to infer discrimination from their allegations. Plaintiffs repeatedly attempt to stretch already vague, speculative, and conclusional testimony to create an inference of intentional discrimination. Plaintiffs failed to meet their burden, however, because they did not cite to specific facts based on their own personal knowledge or the testimony of others to support their allegations. *Adams*

v. *Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (disregarding similar unsupported, conclusory allegations).

Plaintiffs' allegation that Tate required African-American employees to carry a heavier workload than Caucasian employees is wholly unsubstantiated by the record. When Posley was directly questioned whether the African-American and Caucasian employees carried uneven workloads, Posley answered that she did not know.

Similarly, Bell's allegation that Tate discriminatorily assigned a temporary worker is contradicted by her admission that she had already been assigned an assistant at the time the temporary employee was hired. Bell further admitted that Thompson, a Caucasian employee, did not have an assistant. The mere fact that Bell was unhappy with the work performed by her assistant is insufficient to defeat summary judgment.

Plaintiffs' allegation that Tate "yelled at and demeaned" African-American employees, but was "polite and cordial" to Caucasian employees also finds no support in the record. In support of their allegation, Plaintiffs cite only Bell's deposition testimony where she refers to a single incident in which Tate questioned her for being late to work. Aside from the fact that there is nothing in Bell's testimony to indicate that Tate raised his voice or treated Bell with disrespect, a single incident of the type alleged by Plaintiffs is insufficient to raise an inference of intentional discrimination.

Plaintiffs rely on Posley's deposition testimony to support their allegation that Tate discriminatorily approved vacation requests. Posley testified that Tate had told her that he could not approve her vacation request "until after some date in February." Sobodas told Posley, however, that Tate had given Sobodas "more than a day or two" for a house closing. Posley's

22

testimony regarding what Sobodas told her about Tate's alleged approval of her vacation request is inadmissible hearsay and thus, cannot be relied on to support an inference of intentional discrimination. *See Russell* v. *Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (racial motives cannot be established by hearsay evidence). Moreover, Posley could not recall any of the relevant circumstances surrounding the two vacation requests, including how much vacation she requested, for what time period, and how far in advance she submitted the request. As a consequence, even if the court accepted that Sobodas' vacation request was approved, there is no basis to conclude that the disparate treatment was the result of racial bias and not simply disparate circumstances.

Plaintiffs' allegation that Tate maintained a segregated seating arrangement is contradicted by the testimony of Sobodas, Thompson and Kendrick, all of whom testified that the employees in the Reconciliation Department were permitted to select their own seats. Furthermore, Plaintiffs' assertion that Tate told Plaintiffs that the seating arrangement was required because "Sobodas might be disturbed by the Plaintiff's [sic] 'own' black music" is unsupported by their deposition testimony. Plaintiffs testified only that "[Tate] kind of implied that [Sobodas] had - because she had - for whatever reasons she had one taste in things and we would have a different taste, stuff like that. I mean nothing – that one would point a finger at and - you know he didn't say anything, you know. At least I can't remember him saying anything outside from that comment." Even if an inference could be drawn from Plaintiffs' testimony that Tate intentionally maintained a segregated workplace environment, there is no basis to conclude from Tate's implied comment that he had a discriminatory animus against African-Americans. In fact, at most, Plaintiffs' testimony suggests that Tate believed, however inappropriately, that

segregating African-American employees from Caucasian employees would create a more harmonious workplace. As such, there is no evidence linking Tate's alleged maintenance of a segregated seating arrangement to the contested employment decision. *See Gorence* v. *Eage Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (stating that "there must be a real link between the bigotry and an adverse employment action.").

Plaintiffs further argue that Tate's hostility to African-Americans is evidenced by the fact that Tate reported an African-American employee's absenteeism to the human resources department, while he took no action when Thompson was absent. The evidence cited by Plaintiffs, however, does not support the assertion that Tate took "no action" with regard to Thompson's absences. In fact, since Plaintiffs failed to specifically question any LaSalle employee on the issue of whether Thompson was disciplined in 2001 for absenteeism, the record is silent on the issue. But even if Tate treated Thompson differently, Plaintiffs still cannot demonstrate that he gave her preferential treatment because Plaintiffs failed to put forth facts that would allow the court to determine whether Thompson's and the African-American employee's conduct were so similar as to presumptively warrant similar treatment. Contrary to Plaintiffs' suggestion, LaSalle policy does not require a supervisor to report an employee's absences to the human resources department anytime an employee misses three or more days within a three-month period. Instead, LaSalle policy requires only that a supervisor have a discussion with the employee regarding their absences. Thus, LaSalle policy endows its supervisors with the discretion to assess whether an employee's absences merit discipline. In this case, there is no evidence that Tate exercised that discretion in a discriminatory fashion.

Bell's 2001 performance review likewise does not establish Tate's alleged racial hostility.

24

First, Bell concedes that she did not disagree in principle with Tate's review. Bell testified that "I wouldn't say he was questioning my knowledge [on the wire account]. It may have been he used some verbage [*sic*] that I just did not agree with." Second, Bell testified that her involvement with the wire account predated Tate's hiring. This testimony acknowledges that Tate's review was based on an incomplete appreciation of her work on the account. Tate himself seemed to acknowledge as much by agreeing to change the review after speaking with Kendrick, who was more familiar with Bell's contributions. Furthermore, there is no evidence that Tate's original review of Bell's work on the wire account reduced Bell's overall 2001 rounded performance rating or that it would have otherwise adversely affected her eligibility for promotions, salary increases, or other tangible job benefits. Finally, even if Bell's 2001 performance review was interpreted to reveal that Tate harbored a bias against Bell, it provides no basis to infer that his bias was racially motivated, since Posley did not challenge her "exceeds expectations" 2001 performance review. Under these circumstances, any inference that could possibly be drawn from Bell's original 2001 performance review is too weak to allow Plaintiffs to survive summary judgment.

Plaintiffs contend that Tate betrayed his preference for Caucasian employees by giving Thompson an "exceeds expectations" for "attendance/dependability" despite the fact that she missed three days in the fourth quarter of 2001. There is no evidence that three absences in a three-month period represents a per se violation of LaSalle's attendance policy. LaSalle requires only that, in those circumstances, an employee provide their supervisor with a legitimate justification for their absences. In most instances, of course, an employee would have little difficulty doing so. There is no evidence that Thompson missed a single day in 2001 aside from

the three absences in August and September, and, perhaps more importantly, there is no evidence that she failed to timely complete any of her assignments. As such, there is no basis to conclude that Thompson's 2001 "attendance/dependability" performance rating was unjustified.

Plaintiffs allege that Tate revised the written requirements for the Senior Analyst position in an effort to justify LaSalle's promotion decisions. In support of their allegation, Plaintiffs cite to a "To-Do" list prepared by Tate for the week of January 22, 2002, which reminds Tate to "develop list of requirements for Senior Reconciliation Analyst Position and identify where Arnissa Bell did not meet these requirements." Even considered in the light most favorable to Plaintiffs, Tate's "To-Do" list cannot be viewed as evidence of a discriminatory animus. At most, Tate's "To-Do" list could imply that Tate was hostile to Bell because there is no evidence that the revised job description worked to the disadvantage of Posley, Fields-Feagins, or any other African-American employee in the Reconciliation Department. But even that implication is foreclosed because Bell cannot show that she met the unrevised written requirements. Since there is no evidence that Bell was prejudiced by Tate's revision of the job requirements, there is no basis to infer discriminatory intent from Tate's "To-Do" list.

Plaintiffs also argue that Tate afforded Sobodas preferential treatment in her 2001 performance review. Specifically, Plaintiffs contend that Sobodas improperly received a pay increase when the human resources department incorrectly identified Sobodas' rounded performance rating to be "1" or "far exceeds expectations," when in fact her performance rating was a "2" or "exceeds expectations." It is undisputed, however, that Sobodas received the so-called preferential treatment from the human resources department, not from Tate or Kendrick. As a consequence, Plaintiffs' argument fails because they cannot link the alleged preferential

26

treatment to any decision-maker responsible for the employment decisions at issue. *Adams*, 324 F.3d at 939.

Plaintiffs next argue that LaSalle's contradictory explanations for Sobodas' promotion demonstrates that LaSalle preferred Caucasian employees. Plaintiffs' argument fails, however, because there is no evidence to support their claim that LaSalle has proffered shifting explanations for its decisions. With respect to Sobodas, Plaintiffs' contention that the explanations proffered by Grubbs and Delany are inconsistent is based on an unduly narrow reading of their deposition testimony. Both Grubbs and Delany testified that Kendrick was the primary decision-maker regarding Sobodas' promotion and that they each learned separately from her why Sobodas deserved to be promoted to Senior Analyst. The fact that Grubbs recalled Kendrick's emphasizing Sobodas' experience while Delany thought Sobodas' promotion was based on her performance in the Reconciliation Department is immaterial in light of Kendrick's testimony that Sobodas was promoted for both reasons. No inference of discrimination can be drawn from incomplete explanations proffered by employees who were not responsible for the promotion decision.

Finally, Plaintiffs assert that Kendrick was also hostile to African-Americans. Plaintiffs' argument is based solely on the fact that Kendrick allegedly "resented" that she was not permitted to terminate Tate's employment because of LaSalle's pursuit of affirmative action goals. The mere fact that Kendrick disagreed with her supervisor's decision to retain an employee whom Kendrick believed had serious and uncorrectable performance deficiencies is not evidence of racial bias. When considered in light of the fact that Kendrick hired Tate and, after receiving her supervisor's instructions, dutifully worked to develop him, there is no basis to

27

infer that Kendrick's termination recommendation was not based on her good faith appraisal of his performance. *See Johnson* v. *Zema Sys. Corp.*, 170 F.3d 734, 744-45 (7th Cir. 1999) (recognizing an inference of non-discrimination when the same individual both hires and fires the plaintiff based on the common-sense notion that someone who intended to discriminate against a person would never initially hire that person).

In light of the foregoing, the court finds that Plaintiffs have failed to present enough circumstantial evidence to form a "convincing mosaic" of intentional discrimination.

## B.    Disparate Treatment - Indirect Method of Proof

Under the indirect method of proof, the plaintiff bears the burden of producing evidence to establish a *prima facie* case of discrimination. *Rhodes*, 359 F.3d at 504. To establish a *prima facie* case of race discrimination, Plaintiffs must produce evidence that (1) they belong to a protected class; (2) they performed their job according to their employer's legitimate expectations; (3) they suffered an adverse employment action; and (4) a similarly-situated employee who was not a member of a protected class was treated more favorably. *Id.* If the Plaintiffs meet this burden, LaSalle must then articulate a legitimate, non-discriminatory reason for its action. If LaSalle offers a legitimate, non-discriminatory reason, the burden shifts back to Plaintiffs to present evidence that LaSalle's proffered reason is a pretext for discrimination. *Id.* If Plaintiffs produce evidence of pretext, a fact-finder could infer discrimination.

For purposes of summary judgment, LaSalle concedes that Plaintiffs can establish a *prima facie* case of discrimination and presents legitimate, non-discriminatory reasons for its promotion decisions. Thus, the relevant inquiry is only whether LaSalle's proffered reasons are pretextual.

Plaintiffs may establish pretext "directly with evidence that [an] employer was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Wade* v. *Lerner New York, Inc.*, 243 F.3d 319, 321 (7th Cir. 2001). Plaintiffs may proceed indirectly by attempting to show that LaSalle's "ostensible justification is unworthy of credence" through evidence "tending to prove that [LaSalle's] proffered reasons are factually baseless, were not the actual motivation for the [contested employment decision] in question, or were insufficient to motivate the [decision.]" *Testerman* v. *EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) (quotations omitted). "When a plaintiff uses the indirect method of proof, no one piece of evidence need support a finding of [race] discrimination, but rather the court must take the facts as a whole." *Huff* v. *UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997) (citation omitted).

## 1. Julia Posley - Failure to promote at the time of Thompson's transfer

LaSalle contends that Posley was not promoted at the time Thompson transferred into the unit as a Senior Analyst because Posley (1) had not been in the Reconciliation Department for very long; (2) had not demonstrated the ability to take on complex analytical work; and (3) possessed relatively little securities and industry knowledge.

Plaintiffs first argue that the fact that Thompson was brought into the Reconciliation Department as a Senior Analyst, despite having no prior experience in the unit, shows that LaSalle did not regard a long tenure in the unit as a prerequisite to the Senior Analyst position. While true, it is immaterial because nothing in the record suggests that LaSalle has ever required an individual to work in the Reconciliation Department as an Analyst I before being promoted to Senior Analyst. Instead, LaSalle, like most employers, hires qualified individuals from outside

its organization to fill non-entry level positions.

In this case, Kendrick testified that she believed that Thompson already possessed the qualifications of a Senior Analyst when she transferred into the unit.[4] Plaintiffs, on the other hand, do not allege that they should have been hired as Senior Analyst, and thus, they acknowledge that they could only become qualified for the position by working in the unit. As such, LaSalle appropriately considered Posley's relatively brief tenure when assessing whether she was qualified for promotion.

Plaintiffs also argue that Posley's alleged inability to take on complex analytical work could not have been a motivating factor in LaSalle's promotion decision because Kendrick acknowledged that Thompson had not demonstrated *to her* the ability to handle complex assignments before she was brought into the department as a Senior Analyst. Plaintiffs' argument again confuses disparate treatment with disparate circumstances. Posley was a relatively new Reconciliation Department employee whose prior lower-level position at LaSalle was "vastly different"and did not involve reconciling out-of-balance accounts. As such, Kendrick could only reliably evaluate Posley's analytical ability based on her personal observation of Posley's work. Thompson, in contrast, was a LaSalle officer seeking a transfer

---

[4]Plaintiffs point out that Thompson's performance both before and after her transfer into the Reconciliation Department casts doubt on whether she should have been brought into the unit as a Senior Analyst. But this evidence merely calls into question Kendrick's judgment, which is irrelevant to a pretext determination. *See Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well considered.") (citation omitted). Plaintiffs present no evidence to suggest that Kendrick was aware of the criticisms raised in Thompson's 2001 performance review. Indeed, Kendrick's uncontradicted testimony shows that she hired Thompson into the unit based on her direct observation of Thompson's work in another department at LaSalle, Thompson's service as an accountant in the accounting department, Thompson's knowledge of the same products that were processed in the Reconciliation Department, and her belief that Thompson was a degreed accountant. There was nothing unreasonable about Kendrick's failure to conduct a more thorough investigation of Thompson's job performance and qualifications because Thompson was a long-tenured LaSalle managerial officer transferring to a lower level position. Accordingly, Plaintiffs fail to demonstrate that Kendrick's proffered reasons for her decisions were pretextual.

into a lower level position and whose job performance had been observed by other LaSalle officers for several years. Thus, Kendrick could reasonably rely on Thompson's supervisor's evaluations of her analytical ability. Kendrick testified that she discussed Thompson's analytical ability with LaSalle employees familiar with Thompson's job performance, including her manager Rick Guthrie, and that they advised her that Thompson had "[g]ood analytical skills."[5] Thus, the evidence demonstrates that Kendrick did in fact regard analytical skills to be an important requirement for the Senior Analyst position.[6]

Finally, there is no evidence of pretext in LaSalle's reliance on Posley's lack of securities and industry knowledge as a reason for its decision not to promote Posley. Kendrick did not have Posley's resume at the time Thompson transferred into the department. As a result, Kendirck did not know the full extent of Posley's industry knowledge when declining to promote Posley to Senior Analyst. But Kendrick did know at the time of Posley's hiring the breadth and depth of Posley's industry knowledge. Since Kendrick was either Posley's manager or received reports from Posley's manager regarding her performance during the fourth quarter of 2000 and the first quarter of 2001, Kendrick was in a position to know whether Posley had markedly altered her understanding of the industry in the few months between her hiring and Kendrick's original promotion decision. As such, while Kendrick's awareness of Posley's industry knowledge may not have been complete, it was more than sufficient to allow her to make an

---

[5]Thompson's work experience and education, both of which Kendrick testified she relied on in making her decision to bring Thompson into the department as a Senior Analyst, further showed that Thompson had strong analytical skills.

[6]Plaintiffs also argue that the fact that complex assignments were not available until right around the time that Thompson was brought into the department is further evidence of pretext. To the contrary, this fact actually corroborates LaSalle's claim that Posley had not demonstrated the ability to handle complex tasks at the time Thompson transferred into the department.

informed decision regarding Posley's qualifications for promotion.

## 2. Julia Posley - Failure to promote at the time of Sobodas' promotion

LaSalle contends that Posley was not promoted when Sobodas became a Senior Analyst because Posley's main internal client, Erlinda Oyos, expressed serious concerns about Posley's performance.

Plaintiffs attempt to show pretext by arguing that LaSalle has proffered conflicting reasons for its promotion decision. An employer's shifting and inconsistent explanations can provide a basis for a finding of pretext. *Rand* v. *CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). But "the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Schuster*, 327 F.3d at 577. Pretext is not established if the proffered explanations are "substantially consistent." *Myrick* v. *Aramark Corp.*, No. 02 C 5890, 2004 WL 906176, at *9 (N.D. Ill. Apr. 28, 2004). *See Herrnreiter* v. *Chicago Hous. Auth.*, No. 98 C 5209, 2001 WL 856623, at *9 (N.D. Ill. July 20, 2001).

Plaintiffs argue that no one ever told Posley that she was being denied a promotion because of alleged problems relating to her servicing internal clients. Instead, Plaintiffs maintain that Tate told Posley that the reason she was not being promoted was because she "did not train a temporary staff person fast enough." Plfs.' Memo. at 11. (internal citation omitted). Plaintiffs' assertion, however, is not supported by the evidence. Posley explicitly testified that her failure to train a temporary employee was only one of the reasons she was not promoted. The fact that Posley cannot now recall the other reasons Tate gave for her failure to receive the promotion does not show that LaSalle proffered inconsistent reasons for its promotion decision.

Plaintiffs also argue that LaSalle has provided conflicting reasons for Sobodas'

32

promotion. LaSalle maintains that Sobodas was promoted because she "had extensive job related experience prior to coming to the Bank and proved, within the first ten months of her employment, that she could perform the most sophisticated work in the Department." Defs. Reply Memo. at 9. This explanation is substantially consistent with the testimony provided by Kendrick, Grubbs and Delany. Plaintiffs attempt to seize upon the fact that Kendrick emphasized Sobodas' prior experience in her conversations with Grubbs regarding Sobodas' qualifications for promotion, while she focused on Sobodas' on-the-job performance in her discussions with Delany. But in each instance Kendrick's recommendation was based on her belief that Sobodas had a sophisticated understanding of reconciliation work.

### 3. Bell - Failure to promote at the time of Sobodas' promotion

LaSalle maintains that Bell was not promoted at the time Sobodas became a Senior Analyst because Kendrick believed that "while Bell possessed many positive attributes, her work in the Reconciliation Department, which included complaints from one of her main internal clients about Bell's 'lack of professionalism' and Bell's unwillingness to take on new responsibilities, indicated [ ] that Bell was not ready for promotion." LaSalle's Reply Memo. at 6.

Plaintiffs first argue that LaSalle's explanation for its promotion decision is inconsistent with the explanation Tate gave Bell in 2001. Bell testified that Tate told her that she was not being promoted because "she had failed to make Kendrick sufficiently aware of her accomplishments." The obvious implication of Tate's comment is that Kendrick did not believe that Bell's experience and performance merited promotion at that time. Thus, Tate's comment is not inconsistent with LaSalle's explanation. Furthermore, as LaSalle points out, Bell concedes

33

that "[Tate] didn't have the authority to make those [promotion] decisions on his own. Jean [Kendrick] made all of the decisions even though [Tate] was the manager." Thus, Bell herself acknowledges that in order to be promoted, she needed to made Kendrick aware of her contributions to the department.

Plaintiffs also argue that Grubbs testified that Kendrick told him that Bell was not qualified for promotion to Senior Analyst, not because of problems servicing internal clients, but because she "did not have the experience necessary to do the sophisticated level of work of the Analyst II position." Kendrick's deposition testimony, however, merely identified Bell's "lack of professionalism" with an internal client as *one* of the performance deficiencies that disqualified Bell for promotion at that time. Setting aside that qualifying statement, the explanation Kendrick gave in her deposition testimony is simply that Bell's performance demonstrated that she was not qualified for promotion. Kendrick's deposition testimony is thus broad enough to encompass a full range of performance deficiencies, including Bell's alleged failure to demonstrate the ability to complete complex assignments. As such, Kendrick's statement to Grubbs is a more precise, not an inconsistent reason for her promotion decision. *See Perfetti v. First Nat. Bank of Chicago*, 950 F.2d 449, 456-57 (7th Cir. 1991) (finding no evidence of pretext where decision-maker simply "elaborated" at trial on his justification for his employment decision).

Plaintiffs further argue that LaSalle denied Bell a promotion at the time Sobodas was promoted despite the fact that Bell satisfied the requirements set forth in the Senior Analyst job description. This argument would have merit if Plaintiffs could establish that Bell was qualified for promotion. But Plaintiffs have failed to establish that Bell was in fact qualified for promotion. And Kendrick's honest belief that Bell had provoked complaints about her "lack of

34

professionalism" and "willingness to take on new responsibilities" reflects that Kendrick did not believe that Bell satisfied a number of the written requirements for the Senior Analyst position, including, but not limited to, that she "be able to step into a leadership role ...."

Finally, Bell argues that LaSalle's explanation for its promotion decision is incredible because LaSalle never informed her of complaints made by her internal clients. Plaintiffs point to no policy, however, requiring LaSalle to communicate performance problems before denying an employee a promotion. And Plaintiffs present no legal authority standing for the proposition that an employee must notify an employee of performance deficiencies before taking an adverse employment action. If anything, Seventh Circuit case law indicates an unwillingness to impose a notice requirement on employers. *See Rand* v. *CF Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994) (finding no evidence of pretext in the fact that an employer failed to document or communicate plaintiff's performance problems before terminating his employment). Accordingly, Plaintiffs fail to show that LaSalle lied about the reasons for its promotion decisions.[7]

### 4. Fields-Feagins - Failure to promote at the time of Sobodas' promotion

LaSalle maintains that Fields-Feagins was not promoted at the time Sobodas became a Senior Analyst because her supervisors "considered her a mediocre performer who did just enough to get by and was not qualified for promotion to Senior Analyst." Defs. Reply Memo. at 8.

---

[7]Bell also argues that she satisfied Kendrick's stated requirements for promotion to Senior Analyst; namely, that Plaintiffs had to be able to "cover" their own desk, as well as the desk of another analyst. Plaintiffs fail to cite to a statement of material fact supporting the assertion that Kendrick verbally revised or summarized the written requirements for the Senior Analyst position. Accordingly, the court disregards this argument.

Plaintiffs attempt to show pretext by arguing that "when [Fields-]Feagins asked Tate why she had not been promoted, Tate provided no answer at all." Plfs. Memo. at 11. But no negative inference can be drawn from Tate's silence because Tate did not ultimately make the promotion decision. If Fields-Feagins desired an explanation for LaSalle's decision, she should have gone to the decision-maker, Kendrick. Even if Tate had been the decision-maker, however, Plaintiffs again fail to cite a LaSalle policy or Seventh Circuit authority for the proposition that an inference of pretext may be drawn by an employer's failure to communicate the reasons for its adverse employment action when questioned by the affected employee.

## V.     Retaliation

Plaintiffs allege that LaSalle retaliated against them for filing (1) internal complaints of discrimination; (2) charges of discrimination with the EEOC; and (3) the present lawsuit.

Under Title VII, it is unlawful for an employer to retaliate against an employee for engaging in statutorily-protected activity. 42 U.S.C. §§2000e-2(a)(1). Because Plaintiffs fail to produce direct evidence of retaliation, they must again proceed under the *McDonnell Douglas* burden-shifting framework. To establish a *prima facie* case of retaliation, plaintiffs must show that (1) they engaged in protected activity; (2) they were performing their jobs to LaSalle's satisfaction; (3) they suffered an adverse employment action; and (4) LaSalle treated similarly situated employees who did not engage in statutorily protected activity more favorably. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 861-62 (7th Cir. 2005).

### A.     Internal Complaints of Discrimination

Plaintiffs allege that Tate retaliated against them for filing internal complaints of discrimination by criticizing their job performance both orally and in writing. This allegation is

insufficient to defeat summary judgment because negative performance evaluations are by themselves not adverse employment actions. *See Oest* v. *Ill. Dept. of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001). Accordingly, Plaintiffs have failed to establish a *prima facie* case of retaliation.

**B.    Charge of Discrimination with the EEOC**

Plaintiffs next allege that LaSalle retaliated against them for filing charges of discrimination with the EEOC by (1) failing to adequately investigate their complaints of discrimination; (2) disciplining Fields-Feagins for a "group disturbance;" and (3) issuing Posley a "final written warning." Plaintiffs' claims regarding LaSalle's investigation and Fields-Feagins' reprimand again fail because neither of these actions constitute adverse employment actions. *See Oest*, 240 F.3d, at 613. The "final written warning" issued to Posley, however, is an adverse employment action because it materially altered the terms of Posley's employment by disqualifying her for salary increases and promotions, and by bringing her to the final stage of LaSalle's progressive discipline program. Posley's claim nevertheless fails because she cannot rebut LaSalle's legitimate, non-discriminatory reason for its action.

Vander Lugt testified that Posley was given a "final written warning" because she failed to complete an assigned reconciliation project and then failed to inform her supervisor that the work had not been done. Posley contends that LaSalle's explanation is pretextual, arguing first that LaSalle's explanation has no basis in fact. Posley's argument, however, is not supported by the record. It is undisputed that Posley was assigned the account sometime in mid-September, failed to perform the reconciliations for several weeks, and then delayed informing Halter that the work had not been done until early October. These undisputed facts are the precise basis on

37

which LaSalle issued the "final written warning."

The fact that Grubbs initially disagreed with LaSalle's decision to issue the "final written warning" is not evidence of pretext. First, it is not clear that Grubbs disagreed with the decision. While he initially expressed concern with the severity of the punishment, after being advised by Vander Lugt of the basis for her decision, he sent an email to Vander Lugt and the other decision-makers stating "... I fully support your decision to keep this as a final warning." Regardless, there is no basis to infer pretext from the mere fact that one of several decision-makers opposed the contested employment decision. The relevant inquiry is not whether LaSalle's decision was correct, but whether it was proscribed by Congressional statute.[8] *See McCoy* v. *WGN Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992) (citations omitted) (the court does "not sit as a super-personnel department that re-examines an entity's business decisions."). Posley has made no attempt to show that she was treated differently from Caucasian employees with respect to the issuance of "final written warnings," and thus, there is no basis to infer pretext.

### C. Present Lawsuit

Plaintiffs further argue that LaSalle retaliated against them for filing the present lawsuit by (1) terminating Bell's and Posley's employment and (2) designating Fields-Feagins as ineligible for rehire following her resignation.[9]

---

[8]Posley's argument that she was entitled to graduated discipline fails for the same reason. Posley fails to cite to a LaSalle policy stating that a "final written warning" may not be issued until an employee has been issued a lesser warning. As such, there is no basis to infer retaliation from LaSalle's decision to issue a "final written warning" for Posley's first violation.

[9]Plaintiffs' so-called "other evidence of retaliation" does not support an inference of retaliation. Posley's allegation that she was not invited to work meetings is not supported by the record. LaSalle failed to invite Posley to a single meeting and when her supervisor learned of the oversight she apologized to Posley numerous times. Plaintiffs' assertions that unidentified LaSalle employees made negative remarks about Plaintiffs to other LaSalle employees is based on inadmissible hearsay. The fact that Posley received her final paycheck "a week or two late" is irrelevant since Plaintiffs' failed to put forth evidence that terminated employees outside the protected class received

38

LaSalle maintains that Plaintiffs were terminated for violating a LaSalle policy that prohibits taking documents out of the bank for any reason. Plaintiffs admit that they violated LaSalle's policy but contend that copying LaSalle's documents and disclosing them to their attorney for use in the present lawsuit is protected activity.

Protected activity includes "oppos[ing] any practice made an unlawful employment practice" by Title VII, Section 704(a), or "ma[king] a charge, testif[ing], assist[ing], or participat[ing] in an investigation, proceeding or hearing" under Section 704(a). 42 U.S.C. § 2000e-3(a). The distinction between participation clause protection and opposition clause protection is significant because the scope of protection for activity falling under the participation clause is broader than for activity falling under the opposition clause. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989). Since Plaintiffs copied and disseminated the LaSalle documents in order to collect and preserve evidence in support of their charge of discrimination, Plaintiffs' conduct is best addressed under the 'participation' clause. *See, e.g., Ajayi v. Aramark Bus. Services, Inc.*, 2004 WL 763840 (N.D. Ill. Mar. 3, 2004).

Plaintiffs contend that their surreptitious copying of LaSalle documents and subsequent disclosure of them to their attorney is protected activity because the documents were discovered in public areas, were not marked confidential, and were believed to support their claims of discrimination. In support of their argument, Plaintiffs cite *Ajayi*, 2004 WL 763840. The

---

their paychecks any faster. Likewise, Plaintiffs failed to show that LaSalle treated them differently by opposing Bell's and Posley's receipt of unemployment benefits.

plaintiff in *Ajayi* photocopied time cards to which she routinely had access, because the EEOC

had requested them while investigating her charge of discrimination. The court found that, under

those circumstances, the plaintiff was "assist[ing], or participat[ing] ... in an [EEOC]

investigation, proceeding, or hearing," and thus, her conduct was protected.

The circumstances in this case, however, are markedly different. There is no evidence

that the EEOC or Plaintiffs' attorney ever requested that Plaintiffs copy LaSalle's documents.

Moreover, unlike the plaintiff in *Ajayi*, Plaintiffs photocopied documents that were not readily

available to them. Indeed, Plaintiffs photocopied their supervisor's tasks lists, portions of the

personnel records of Thompson and Sobodas, and e-mails between Tate and other LaSalle

management employees. While Plaintiffs perhaps innocently acquired the documents discovered

on the office copier, the documents taken out the trash can were discovered only by scavenging

through the documents and materials removed from Tate's desk following his termination. Thus,

whereas the plaintiff in *Ajayi* discovered documents in the normal course of business, Plaintiffs

engaged in a deliberate effort to uncover evidence to support their claims.

As a consequence, this case is more akin to *Laughlin* v. *Metro. Wash. Airports* Auth., 149

F.3d 253 (4th Cir. 1998) (plaintiff's copying of personnel records found during an unauthorized

search of plaintiff's supervisor's desk was not protected activity under Title VII's opposition

clause), *O'Day* v. *McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996) (plaintiff's

copying of documents found during an unauthorized search of plaintiff's supervisor's office was

not protected activity under Title VII's opposition clause), and *Watkins* v. *Ford Motor Co.*, 2005

WL 3448036 (S.D. Ohio, Dec. 15, 2005) (plaintiff's copying of documents from a binder found

in open view was not protected activity under Ohio's anti-discrimination laws). Like the

plaintiffs in *Laughlin*, *O'Day*, and *Watkins*, Plaintiffs here committed a breach of LaSalle's trust by rummaging through LaSalle's trash can and copying documents that were personal if not confidential in nature and then providing those documents to their attorneys. As the court stated in *Watkins*, if such activity were protected, "plaintiffs everywhere would be entitled, under the umbrella of protected activity, to steal company information and, so long as they give the information to their lawyer, not only be able to avoid disciplinary action by their employer, but also be empowered to successfully maintain a claim against their employer if adverse action is taken for the misconduct." *Watson*, 2005 WL 3448036, *7. The court is not persuaded that the Seventh Circuit would countenance such a result. Accordingly, Plaintiffs' unauthorized copying and dissemination of LaSalle documents was not protected activity, and therefore, Bell and Posley have failed to establish a *prima facie* case of retaliation.

Fields-Feagins' allegation that LaSalle retaliated against her by designating her ineligible for rehire is contradicted by Plaintiffs' responses to LaSalle's statement of material facts. Plaintiffs admit that following Field-Feagins' resignation a human resources employee who filled out Fields-Feagins "Personnel Action Form" mistakenly designated her as ineligible for rehire. DAF at ¶ 89. Plaintiffs further admit that once the mistake was brought to his attention, the "Personnel Action Form" was revised designating Fields-Feagins eligible for rehire effective the date of her resignation.[10] *Id.*

---

[10]Fields-Feagins appears to put forth other claims of retaliation in Plaintiffs' response memorandum. But Fields-Feagins admitted in Plaintiffs' responses to LaSalle's statement of material facts that the eligibility for rehire claim was her only allegation of retaliation. *See* Pls.' Resp. to Defs.' L.R. 56.1 Statement of Material Facts ¶ 89. Since those admissions were made following the close of discovery, the court declines to consider any new claims of retaliation raised for the first time in Plaintiffs' response brief. *See Koszola* v. *Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (courts will not consider factual claims that contradict a party's Rule 56.1 Statement).

41

**ORDER**

For the reasons stated above, Plaintiffs' motion to strike [#102] is granted in part and denied in part. Plaintiffs' motion for partial summary judgment (#72) is denied. LaSalle's motions to strike [#95, 96] are granted in part and denied in part. LaSalle's motion for summary judgment (#70) is granted.

Dated: March 28, 2006                     Enter: _Joan H Lefkow_____

                                          JOAN HUMPHREY LEFKOW
                                          United States District Judge